# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

PHILADELPHIA FEDERATION OF TEACHERS
HEALTH AND WELFARE FUND, on behalf of
itself and all others similarly situated,

        *Plaintiff*,

      v.

ACTAVIS HOLDCO U.S., INC., APOTEX CORP.,
DR. REDDY'S LABORATORIES, INC.,
GLENMARK PHARMACEUTICALS INC., USA,
LUPIN PHARMACEUTICALS, INC., MYLAN
INC., MYLAN PHARMACEUTICALS INC.,
TEVA PHARMACEUTICALS USA, INC., and
ZYDUS PHARMACEUTICALS (USA) INC.,

        *Defendants*.

No. _____

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

      1.      Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund, on behalf of itself and all others similarly situated, brings this class action for claims under federal and state antitrust laws to recover damages and obtain injunctive and equitable relief for the substantial injuries it and others similarly situated have sustained against Defendants, the largest generic drug manufacturers in the world, arising from their conspiracy to raise the prices of pravastatin sodium tablets ("pravastatin"), and to allocate markets and customers for pravastatin in the United States.

2.      Plaintiff's claims arise from a broad-based conspiracy by numerous generic drug manufacturers, including Defendants here, to raise and fix the prices of more than a dozen generic drugs, including pravastatin, which is at issue in this Complaint.

3.      Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## NATURE OF THE ACTION

4.      Pravastatin is commonly prescribed lipid (fat) control drug indicated to treat hypercholesteremia (*i.e.*, high cholesterol and triglycerides).

5.      Significantly, pravastatin is not a new compound. Pravastatin was introduced in the early 1990s and has been on the market for over 20 years.

6.      Generic versions pravastatin have been on the market for years and, for most of that time, have been priced significantly lower than their branded counterparts—in many instances priced at pennies per tablet. This is because the presence of generic drugs usually results in vigorous price competition, benefiting consumers and third-party payers through lower prices.

7.      Recently, however, pravastatin has experienced unprecedented price increases. For example, between the fourth quarter of 2013 and the beginning of the second quarter of 2014, the price of pravastatin has increased between ***300% and 600%***, depending on the dosage strength and package size. The U.S. Government Accountability Office ("GAO") noted that pravastatin had experienced "extraordinary price increases" between 2010 and 2015.[1]

---

[1] *See* GAO, *Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases*, No. 16-706, App'x III (Aug. 2016), http://www.gao.gov/assets/680/679022.pdf .

8.      These price hikes were not the result of competitive market forces; instead, they were the result of Defendants' conspiracy to fix, raise, maintain, and stabilize the prices of, as well as allocate customers and markets for, pravastatin. Defendants are among the world's largest generic drug manufacturers: Actavis Holdco U.S., Inc.; Apotex Corp.; Dr. Reddy's Laboratories, Inc.; Glenmark Pharmaceuticals Inc. USA; Lupin Pharmaceuticals, Inc.; Mylan Inc.; Mylan Pharmaceuticals Inc.; Teva Pharmaceuticals USA, Inc.; and Zydus Pharmaceuticals (USA) Inc.

9.      Defendants orchestrated their conspiracy through secret communications and meetings, both in private and at public events, such as trade association meetings held by the Generic Pharmaceutical Association ("GPhA"), among others. Oligopolistic conditions—*e.g.*, low numbers of competitors and barriers to entry in the pravastatin market—facilitated Defendants' anticompetitive actions and have allowed them to sustain their unlawful supracompetitive pricing to the present.

10.      Defendants' price increases have also grabbed the attention of government enforcers, members of Congress, the press, and drug purchasers. The Department of Justice's Antitrust Division ("DOJ") and the Connecticut Attorney General's Office ("CTAG")—which is leading a multi-state working group of state attorneys general—are conducting sweeping antitrust probes into allegations that as many as a dozen generic drug manufacturers participated in a broad-based conspiracy to fix, raise, maintain, and stabilize the prices of as many as two-dozen generic drugs, including pravastatin. Significantly, DOJ has issued subpoenas which arise from a federal grand jury proceeding in the Eastern District of Pennsylvania that is investigating whether Defendants and other drug manufacturers conspired to fix generic drug prices.

11.     DOJ's and CTAG's investigations started in summer 2014, with each agency issuing subpoenas to Lannett and Impax concerning their contacts with competitors, sales, and pricing of generic digoxin tablets—a commonly prescribed heart medication. Following the DOJ's and CTAG's subpoenas to Impax and Lannett, DOJ also subpoenaed Par, seeking documents and testimony concerning the pricing of digoxin.

12.     By late 2014, DOJ's probe expanded further to include manufacturers of doxycycline such as Actavis, Lannett, Mayne Pharma, Mylan, and Par, which all received similar subpoenas.

13.     In August 2016, Teva and Dr. Reddy's, which manufacture pravastatin, also disclosed that they received subpoenas from the DOJ. In September 2016, Taro Pharmaceuticals, disclosed that it, "as well as two senior officers in its commercial team, received grand jury subpoenas from the [DOJ]," seeking, among other things, "communications with competitors and others regarding the sale of generic pharmaceutical products."[2] Zydus is also under federal investigation concerning its competitor contacts and pricing of divalproex ER.

14.     And most recently, on November 10, 2016, Mylan disclosed that it had received a DOJ subpoena concerning four additional drugs—cidofovir, clipizide-metformin, propranolol and verapamil—and that search warrants had been executed.[3] The issuance of warrants represents a significant escalation of the DOJ's investigation given the probable cause requirement.

_____

[2] Taro, SEC Form 6-K (Sept. 9, 2016), http://phx.corporate-ir.net/phoenix.zhtml?c=11469&&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTExMTM0MjU wJkRTRVE9MCZTRVE9MCZTUURFU0M9U0VDVVFlPTl9FTlRJUkUmUmc3Vic2lkPTU3.

[3] Mylan SEC Form 10-Q, at 58 (Nov. 10, 2016), http://apps.shareholder.com/sec/viewerContent.aspx?companyid=ABEA-2LQZGT&docid=11678486#MYL10Q_20160930XDOC_HTM_S582E80BDD4215D11A4040D12D4C2E297.

15.    The DOJ's investigation could also result in the imposition of substantial fines against many generic drug manufacturers, including those named as Defendants here. One analyst has estimated, for example, that Teva could face liability of between $300 million and $700 million, while Mylan could face liability of between $380 million and $770 million. Another analyst estimated that fines industry-wide could exceed $1 billion.[4]

16.    In addition to DOJ's and CTAG's investigations, members of Congress have requested information from generic manufacturers Actavis, Apotex, Impax, Lannett, Mylan, Par, Sun, Teva, West-Ward, and Zydus, concerning their sales of divalproex ER, pravastatin, doxycycline, and digoxin, among numerous other drugs. Members of Congress also requested information from Defendants and other generic drug manufacturers regarding other generic drugs that have similarly undergone significant price increases over the past few years, including albuterol sulfate, glycopyrrolate, neostigmine methylsulfate, and benazepril/ hydrochlorothiazide.

17.    Significantly, recent news reports have stated that investigations are on the cusp of the prosecution phase: *Bloomberg*, *The Wall Street Journal*, and *Reuters* have all reported that, after two years of investigation, DOJ is close to bringing criminal charges against generic drug manufacturers, with sources stating that the charges could be brought as early as the end of 2016.[5]

---

[4] Eric Saonowsky, *DOJ's price-fixing investigation could lead to sizable liabilities, analyst says*, FiercePharma (Nov. 10, 2016), http://www.fiercepharma.com/pharma/doj-s-price-fixing-investigation-could-lead-to-sizable-liabilities-analyst-says.

[5] *See* David McLaughlin & Caroline Chen, *U.S. Charges in Generic-Drug Probe to Be File by Year-End*, Bloomberg (Nov. 3, 2016), http://bloom.bg/2f1r5rX; Peter Loftus, et al., *Generic-Drug Firms Face Possible Collusion Charges*, Wall St. J. (Nov. 3, 2016), http://www.wsj.com/articles/generic-drug-makers-shares-drop-on-report-of-possible-probe-1478209036; Deena Beasley, *Drug makers under fire for possible price fixing*, Reuters (Nov. 3, 2016), http://reut.rs/2f1IPn0.

18.     As a result of Defendants' scheme to fix, raise, maintain, and stabilize the prices of pravastatin, consumers and third-party payers paid, and continue to pay, supra competitive prices for these generic drugs.

19.     Plaintiff seeks to certify two classes. The first class (the "Injunctive Class") is composed of all individuals and entities in the United States or its territories who indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for pravastatin, other than for resale, for consumption by itself, its families, or its members, employees, insureds, participants, or beneficiaries, from at least as early as October 1, 2013 through and including the date that the anticompetitive effects of Defendants' unlawful conduct ceased (the "Class Period").

20.     The second class (the "Damages Class") is composed of all individuals and entities who, in Alabama, Arizona, California, Florida, Hawaii, Iowa, Kansas, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and the District of Columbia, indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for pravastatin, other than for resale, for consumption by itself, its families, or its members, employees, insureds, participants, or beneficiaries, from at least as early as October 1, 2013 through and including the date that the anticompetitive effects of Defendants' unlawful conduct ceased.

## JURISDICTION AND VENUE

21.     Plaintiff brings this action under Section 16 of the Clayton Act, 15 U.S.C. §26, to obtain injunctive relief and costs of suit, including attorneys' fees, against Defendants for the

injuries that Plaintiff and the other members of the Class have suffered from Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 16 of the Clayton Act, 15 U.S.C. § 26, because this action arises under the federal antitrust laws. This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This Court also has jurisdiction over this matter under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed class exceeds $5,000,000 and at least one member of the Damages Class is a citizen of a state different from that of one of Defendants.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b), (c), and (d) and Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants resided, transacted business, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

25.     Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

26.     Defendants sold and shipped pravastatin in a continuous and uninterrupted flow of interstate commerce. The conspiracy in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate and intrastate commerce.

27.     Each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their conspiracy.

## THE PARTIES

### A.    Plaintiff

28.    Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund ("PFTHWF") is a voluntary employee benefits plan organized pursuant to § 501(c) of the Internal Revenue Code for the purpose of providing health benefits to eligible participants and beneficiaries.  PFTHW maintains its principal place of business in Philadelphia, Pennsylvania. PFTHW provides health benefits, including prescription drug benefits, to approximately 34,000 participants, and their spouses and dependents. During the Class Period, PFTHWF purchased and paid for some or all the purchase price for pravastatin, thereby suffering injury to its business and property by reimbursing more for this product than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers.

### B.    Defendants

#### 1.    Actavis

29.    Defendant Actavis Holdco U.S., Inc. ("Actavis") is a corporation with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey, 07054. In August 2016, Teva Pharmaceuticals U.S., Inc. acquired Actavis from Allergan plc's for $40.5 billion. In connection with this acquisition, Allergan assigned certain assets of its "generics business" to Actavis, so that by acquiring Actavis, Teva also acquired Allergan's generics business. Actavis manufactures, markets, and sells generic drug products. During the Class Period, Actavis sold generic pravastatin in the United States.

### 2.   Apotex

30.   Defendant Apotex Corp. ("**Apotex**") is a corporation with its principal place of business at 2400 North Commerce Parkway, Weston, Florida, 33326. Apotex is a subsidiary of Apotex, Inc., a Canadian company with its principal place of business at 150 Signet Drive, Toronto, Canada, M9L 1T9. Apotex manufactures, markets, and sells various generic drugs. During the Class Period, Apotex sold generic pravastatin in the United States.

### 3.   Dr. Reddy's

31.    Defendant Dr. Reddy's Laboratories, Inc. ("**Dr. Reddy's**") is a corporation with its principal place of business at 107 College Road East, Princeton, New Jersey, 08540. Dr. Reddy's is a subsidiary of Dr. Reddy's Laboratories Ltd., an Indian company with its principal place of business located at 8-2-337, Road No. 3, Banjara Hills, Hyderabad Telangana, India, 5000034. Dr. Reddy's manufactures, markets, and sells various generic drugs. During the Class Period, Dr. Reddy's sold generic pravastatin in the United States.

### 4.   Glenmark

32.   Defendant Glenmark Pharmaceuticals Inc., USA ("**Glenmark**") is a corporation with its principal place of business at 750 Corporate Drive, Mahwah, New Jersey, 07430. Glenmark is a subsidiary of Glenmark Pharmaceuticals Limited, an Indian company with its principal place of business at Glenmark House, B.D. Sawant Marg. Chakala, Off Western Express Highway, Andheri (E), Mumbai, India, 400 099. Glenmark manufactures, markets, and sells various generic drugs. During the Class Period, Glenmark sold generic pravastatin in the United States.

### 5.   Lupin

33.      Defendant Lupin Pharmaceuticals, Inc. ("**Lupin**") is a corporation with its principal place of business at 111 South Calvert Street, Baltimore, Maryland, 21202. Lupin is a subsidiary of Lupin Limited, an Indian company with its principal place of business at B/4 Laxmi Towers, Bandra Kurla Complex, Bandra (E), Mumbai 400 051, India. Lupin manufactures, markets, and sells generic versions of brand pharmaceutical products. During the Class Period, Lupin sold generic pravastatin in the United States.

### 6.   Mylan Defendants

34.      Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business at 1000 Mylan Blvd., Canonsburg, Pennsylvania, 15317.

35.      Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505.

36.      Defendants Mylan Inc. and Mylan Pharmaceuticals Inc. are collectively referred to as "**Mylan**." Mylan manufactures, markets, and sells branded and generic pharmaceutical products in the United States. During the Class Period, Mylan sold generic pravastatin in the United States.

### 7.   Teva

37.      Defendant Teva Pharmaceuticals USA, Inc. ("**Teva**") is a Pennsylvania-based corporation with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454. Teva is a subsidiary of Teva Pharmaceutical Industries Limited, an Israeli company with principal place of business located at 5 Basel Street, Petach Tikva, Israel 49131. Teva manufactures, markets, and sells various generic pharmaceutical products. During the Class Period, Teva manufactured and sold generic pravastatin in the United States.

### 8. Zydus

38.     Defendant Zydus Pharmaceuticals (USA) Inc. ("**Zydus**") is a New Jersey corporation with its principal place of business at 73 Route 31 N, Pennington, New Jersey, 08534. Zydus is a subsidiary of Zydus Pharmaceuticals Limited, an Indian pharmaceutical company. Zydus manufactures, markets, and sells various generic pharmaceutical products. During the Class Period, Zydus manufactured and sold generic pravastatin in the United States.

************

39.     Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus are referred to collectively as "**Defendants**."

40.     Various other entities and individuals unknown to Plaintiff at this time participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of the unlawful conduct alleged herein.

## GENERIC DRUGS REDUCE PRESCRIPTION DRUG COSTS TO PATIENTS AND THIRD-PARTY PAYORS

41.     When generic versions of a branded drug—whether a generic manufactured and sold by an independent generic manufacturer or an "authorized generic," or "branded generic," sold by or pursuant to an agreement with the branded manufacturer—enter the market, they quickly gain substantial market share.

42.     Empirical studies have shown that within a year of generic entry, generics typically will have obtained about 90% of the market, *i.e.*, pharmacists will fill 90 of every 100 prescriptions with a generic. Indeed, according to IMS Health data, generic drugs as a whole

have increased the share of total prescriptions steadily since 2004, and as of 2013, account for 86% of all drugs dispensed in the United States.[6]

**Percent share of prescriptions**



43.    When generic drugs are launched, they are typically priced below the prices of their branded counterparts. Indeed, in a competitive market, each successive generic product that enters the market lowers the prices of all similar generic products because each entry increases competition for sales and market share. A Food and Drug Administration ("FDA") study demonstrates this effect in the following chart:[7]

---

[6] IMS Institute for Healthcare Informatics, Medicine use and shifting costs of healthcare: A review of the use of medicines in the United States in 2013 (Apr. 2014), at 51, http://www.plannedparenthoodadvocate.org/2014/IIHI_US_Use_of_Meds_for_2013.pdf.

[7] FDA, Generic Competition and Drug Prices, http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm129385.htm.

**Generic Competition and Drug Prices**



Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

44.      More recent evidence obtained by the GAO suggests that each subsequent entry by a rival drug company typically generates a 20% price decline.

45.      A Federal Trade Commission study confirmed the FDA's analyses, finding that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."[8]

46.      Thus, generic competition to even a single brand drug can provide potentially billions of dollars in savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs, which reimburse the cost of drug purchases by covered individuals. Indeed, one study found that the use of generic medicines saved the U.S. healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[9]

---

[8] FTC Staff Study, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST CONSUMERS BILLIONS, at 8 (Jan. 2010), *available at* http://emmanuelcombe.org/delay.pdf.

[9] Generic Pharmaceutical Association, *Generic Drug Savings in the U.S.*, at 1 (2015), http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

47.     These consumer welfare-enhancing attributes of generic drug competition were bolstered by the enactment of the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act." The Hatch-Waxman Act simplifies the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Instead of filing a lengthy and costly New Drug Application ("NDA"), the Hatch-Waxman Act allows generic drug manufacturers to obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA").

48.     If an ANDA applicant shows that the generic drug is bioequivalent to the brand drug, then the ANDA applicant may rely on scientific and other data compiled in the brand drug's NDA, including safety and efficacy data. The ability to rely on the scientific data published in the referenced brand drug's NDA obviates the need for duplicative and expensive experimentation and clinical trials. The FDA must approve an ANDA unless the information submitted in the ANDA is insufficient to meet the requirements under the Hatch-Waxman Act.

49.     In connection with the approval of a generic drug, the FDA will assign a "Therapeutic Equivalence Code" ranging from "AA" to "BX." An "AB" rating signifies that the approved generic product is therapeutically equivalent to its branded counterpart. An AB rating is significant because under state generic drug substitution laws, pharmacists are permitted—and, in many cases, must—substitute the branded product for its cheaper generic counterpart. Moreover, in about 20 states, non-AB rated generic drugs can be substituted for their branded counterparts subject to certain considerations, including informed consent from patient or

physician and whether the switch is appropriate in a pharmacist's professional judgment.[10] This inures to the financial benefit of consumers and third-party payors.

50.     In sum, the streamlined approval process under the Hatch-Waxman Act makes it easier for generic drug manufacturers to bring competing and cheaper generic products to market.

## FACTUAL BACKGROUND REGARDING PRAVASTATIN

51.     Pravastatin is a drug used for the treatment of high cholesterol and triglycerides. It is part of a class of drugs known as "statins." Pravastatin is a derivative of compactin, which was identified in the 1970s by researchers at Sankyo Pharma Inc.

### 1.     Brand Manufacturer of Pravastatin

52.     Bristol Myers Squibb ("BMS") manufactures and sells a branded version of pravastatin under the name Pravachol®. BMS received approval for Pravachol (NDA 019898) on October 31, 1991, and began selling its pravastatin product soon thereafter. Pravachol was a blockbuster drug for BMS, generating over $1 billion in annual sales.

### 2.     Generic Manufacturers of Pravastatin

53.     Generic drug manufacturers that currently market generic versions of pravastatin include Apotex, Dr. Reddy's, Glenmark, Lupin, and Teva. Apotex, Glenmark, and Teva are the dominant players in the market, while Actavis, Dr. Reddy's, and Lupin are smaller, but still significant, players.

---

[10]

http://pharmacistsletter.therapeuticresearch.com/pl/ArticleDD.aspx?nidchk=1&cs=&s=PL&pt=2&segment=1186&d d=220901&AspxAutoDetectCookieSupport=1.

      (a)     Actavis received approval to market generic versions of pravastatin in October 2006.

      (b)     Apotex received approval to market generic versions of pravastatin in October 2006.

      (c)     Glenmark received approval to market generic versions of pravastatin in December 2007.

      (d)     Teva received approval to market generic versions of pravastatin in April 2006.

      (e)     Dr. Reddy's received approval to market generic versions of pravastatin in October 2006.

      (f)     Lupin received approval to market generic versions of pravastatin in January 2008.

54.     Sun Pharma's subsidiary, Ranbaxy Laboratories, also manufactured and sold generic pravastatin in the United States through January 2012. However, significant compliance issues at one of Ranbaxy's Indian manufacturing plants resulted in the FDA withdrawing approval of 27 Ranbaxy ANDAs—including its ANDA for pravastatin—as part of a consent decree between Ranbaxy, FDA, and DOJ.

## DEFENDANTS' WRONGDOING

### A.    Defendants Conspired to Fix, Raise, Maintain, and Stabilize the Prices of Pravastatin

55.     As part of their conspiracy, Defendants agreed to raise the prices of pravastatin sold in the United States. Prices for pravastatin inexplicably rose from only a few pennies per tablet to nearly $1.00 per tablet. According to a *New York Times* article, the "price that hospitals

and pharmacies . . . pay for a bottle of pravastatin, a cholesterol-lowering drug, rose to $196 from $27" between October 2013 and April 2014.[11]

56.     The market for pravastatin is dominated by Defendants Apotex, Glenmark, and Teva. Actavis, Dr. Reddy's, and Lupin are smaller, yet still significant, players.

57.     Trade association meetings, including those sponsored by GPhA, provided pravastatin manufacturers with the opportunity to meet and agree to fix pravastatin prices, as well as allocate markets.

58.     As a result of their agreement, whenever certain pravastatin producers raised their prices, others would soon follow. For example, when Teva raised its pravastatin prices at the end of January 2015, Actavis similarly raised its prices for its pravastatin generics the following month.[12]

59.     Plaintiff analyzed several sources of data for pravastatin (some of which is subject to a non-disclosure agreement), including CMS's NADAC data. The data Plaintiff analyzed shows that the price hikes for pravastatin were also generally industry-wide. The chart below shows the average price per unit (tablet) of generic pravastatin between October 2012 and July 2015:

---

[11] Elizabeth Rosenthal, *Official Question the Rising Costs of Generic Drugs*, N.Y. Times (Oct. 7, 2014), http://nyti.ms/1CT14bv.

[12] Steven Valiquette, *et al., U.S. Healthcare Distribution: Generic Inflation Update for February*, at 1 (Mar. 3, 2015).



60.    The data show that prices for pravastatin 40 mg have ***increased over 640%***, from an average market price of $0.09 per tablet as of July 11, 2013 to $0.67 per tablet as of December 18, 2013.

61.    Similarly staggering price increases were found for different package sizes for pravastatin 10 mg, 20 mg, 40 mg, and 80 mg dosages, as noted by Senator Sanders and Representative Cummings in their October 2014 letters to pravastatin producers.

| | | | |
|---|---|---|---|
| **20 mg, 1000 units** | $77 | $368 | **447%** |
| **40 mg, 1000 units** | $114 | $540 | **528%** |
| **10 mg, 500 units** | $27 | $196 | **573%** |
| **80 mg, 500 units** | $59 | $299 | **365%** |
| **10 mg, 90 units** | $6 | $34 | **420%** |
| **20 mg, 90 units** | $7 | $35 | **446%** |
| **40 mg, 90 units** | $9 | $51 | **473%** |

- 18 -

| 80 mg, 90 units | $14 | $52 | 334% |
| --- | --- | --- | --- |

62.     Further, although pravastatin prices have eroded somewhat, they still remain substantially above their October 2012 prices. Defendants' coordinated pricing has deprived, and continues to deprive, Plaintiff and members of the Classes the benefits of free and open competition—namely, lower prices for generic versions of pravastatin. As a result, Plaintiff and members of the Classes have paid and continue to pay non-competitive prices for generic pravastatin.

**B.     Defendants' Conspiratorial Conduct to Fix Prices and Allocate Customers and Markets for Generic Pravastatin**

63.     There are no market-based reasons for the pricing patterns in generic pravastatin market.

64.     Rather, Defendants sustained these supra competitive profits by conspiring to fix, raise, maintain, and stabilize the prices of, and allocate markets and customers for those products. The price increases were the product of Defendants' shared desire to extract monopoly rents from captive drug purchasers.

65.     In formulating and effectuating their conspiracy, Defendants engaged in numerous anticompetitive activities, including, among other things:

(a)     Attending joint meetings or otherwise engaging in joint discussions in the United States by telephone, facsimile, and electronic mail regarding the sale of pravastatin;

(b)     Agreeing to charge prices for pravastatin at specified levels, and otherwise fix, increase, maintain, and stabilize the prices and supply of pravastatin sold to purchasers in the United States;

(c)     Selling pravastatin to customers in the United States at collusive and non-competitive prices pursuant to the agreement reached;

(d)     Accepting payments for pravastatin sold in the United States at collusive and non-competitive prices;

(e)     Communicating with one another to discuss the prices, customers, markets, supply and manufacturing issues, and price levels of pravastatin sold in the United States;

(f)     Authorizing or consenting to the participation of employees in the conspiracy; and

(g)     Concealing the conspiracy and conspiratorial contacts through various means.

66.     The purpose of these secret, conspiratorial meetings, discussions, and communications was to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful price-fixing and market and customer allocation scheme.

67.     As a result of Defendants' unlawful agreement to restrain trade, Plaintiff and members of the Classes were injured because they paid, and continue to pay, supra competitive prices for pravastatin sold in the United States during the period October 1, 2013 through the present.

## GENERIC MARKET FOR PRAVASTATIN IS SUSCEPTIBLE TO A PRICE FIXING CONSPIRACY

**A.      Factors Supporting the Existence of a Conspiracy in the Pravastatin Market**

68.      The structure and other characteristics of the pravastatin market make it conducive to collusion and price-fixing. Specifically, during the Class Period, the pravastatin market exhibited: (1) high barriers to entry; (2) inelasticity of demand; (3) a high degree of commoditization; (4) a high degree of concentration; (5) substantial manufacturer overlap; (6) competitors acting against their economic self-interest; and (7) opportunities to conspire.

**1.      There Are High Barriers to Entry in the Markets for Generic Pravastatin Market**

69.      A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

70.      The pravastatin market has high barriers to entry.

71.      Even though pravastatin is not protected by any patents, regulatory hurdles and the costs of doing business make market entry difficult, time consuming, and expensive. Any generic drug manufacturer seeking to enter the pravastatin market must file an ANDA and receive FDA approval.

72.      To file an ANDA, the generic manufacturer must show that the generic product is bioequivalent to its branded counterpart and invest considerable resources in the development of production lines capable of making the drug. Historically, the cost of filing an ANDA is about $1

million.[13] A generic manufacturer's production facilities must also meet CGMP standards, which increase the costs of production.

73.     Moreover, a generic manufacturer that cannot produce the Active Pharmaceutical Ingredient ("API") for pravastatin must have a reliable and affordable source of API for these products.

74.     Prospective generic manufacturers must also be able to satisfy FDA regulations and guidance governing bioequivalence and bioavailability of their pravastatin products. This requires showing that the proposed generic pravastatin products have, among other things, the same therapeutic qualities and absorption profiles as their branded counterparts.

75.     The failure to meet all FDA requirements concerning manufacturing, testing, and labeling of pravastatin will result in the FDA delaying (or denying) approval of an ANDA. These delays can last for months or even years.

76.     Even if a non-conspiring generic manufacturer were to see an opportunity to compete on price regarding pravastatin, due to the fact that the FDA's review of ANDAs is significantly "backlogged," any potential entrant would necessarily be delayed for years.[14] Indeed, the FDA has stated that as of fiscal year 2015, ANDA approvals can take 40 months or more.[15]

---

[13] Testimony of Dr. Scott Gottlieb, Hearing on "Why Are Some Generic Drugs Skyrocketing in Price?" (Nov. 20, 2014), at 7.

[14] *Id.* at 7.

[15] GAO, *Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases*, No. 16-706, at 26 (Aug. 2016), http://www.gao.gov/assets/680/679022.pdf.

### 2.    Inelasticity of Demand for Pravastatin

77.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline, if any, in the quantity sold of that product. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase the product despite the price increase.

78.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

79.    Demand for pravastatin is highly inelastic because it is a unique product for which there is no reasonable substitute.

80.    Pravastatin is used to treat hypercholesteremia. Other statins are not reasonable substitutes because they have different chemistry, pharmacokinetics, potency, and approved indications than pravastatin. As a result, other statins, such as atorvastatin (Lipitor), rosuvastatin (Crestor), and simvastatin (Zocor), are not considered therapeutically equivalent to pravastatin.

81.    Branded pravastatin does not serve as an economic substitute for generic pravastatin. This is because branded products generally maintain substantial price premiums over their generic counterparts, making them inapt substitutes even when generic prices soar.

82.    For example, other lipid control drugs do not constrain the prices of pravastatin. Indeed, even compounds within the same drug class (here, statins) have no apparent effects on the prices of pravastatin. A study by Dr. David Belk found that while pravastatin's prices rose on

average *four-fold* across all strengths to $0.60 per tablet, the prices of other statins—including

Lipitor (atorvastatin), which only went generic in late 2011—remained around $0.15 per tablet.[16]



**Comparing the Change in Price for Different Statins**

- ○ Average Price for All Doses of Pravastatin
- ○ Average Price for all Doses of Atorvastatin
- ○ Average Price for All Doses of Simvastatin
- ○ Average Price for all Doses of Lovastatin

83.    As the chart above demonstrates, no other statin's prices moved similarly to

pravastatin's prices. Further, the relatively low prices of these other statins had little effect on

pravastatin prices, which remained at or above $0.45 per tablet or *three times* the prices for

atorvastatin, simvastatin, and lovastatin. These price trends suggest that other statins do not serve

as competitive restraints on Defendants' pricing of pravastatin.

84.    Thus, purchasers of generic pravastatin have been and continue to be held captive

to the supra competitive prices that resulted from Defendants' conspiracy to fix prices and

allocate markets and customers.

---

[16] http://truecostofhealthcare.net/wp-content/uploads/2015/01/Generic-Medication-Prices.pdf

- 24 -

### 3.      Pravastatin Is a Commodity Product

85.      When products are subject to commoditization, producers of those products are usually forced to compete on price, as opposed to other factors, such as quality and ancillary services. When price becomes a significant factor in driving demand for a product, producers of a commoditized product have an easier time colluding on price than other non-price factors because price-based collusion is much easier to implement and monitor.

86.      Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. Because the FDA, when approving an ANDA, is required to determine whether a generic drug product is bioequivalent to the brand's NDA, an AB-rating permits a pharmacist to substitute an AB-rated generic for its branded counterpart, as well as to substitute one AB-rated generic for another AB-rated generic for the same branded product. (Depending on a given state's law, a pharmacist may also be able to substitute non-AB rated drugs, provided that certain conditions are met.)

87.      Defendants' pravastatin products are AB-rated generics of their branded version, enabling pharmacists to substitute them for the branded version automatically under their respective state's generic substitution laws.

88.      Moreover, because generic manufacturers generally spend little effort advertising or detailing their generic compounds (*i.e.*, the practice of providing promotional materials and free samples to physicians), the primary means for one generic manufacturer to differentiate its product from another generic competitor's is through price reductions.[17] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

---

[17] *See* Congressional Budget Office, Promotional Spending for Prescription Drugs, Economic & Budget Issues Brief (Dec. 2, 2009), at 1.

### 4.    The Generic Pravastatin Market Is Highly Concentrated

89.     A concentrated market is more susceptible to collusion and other anticompetitive practices.

90.     The pravastatin market is highly concentrated and is dominated by less than ten companies: Actavis, Apotex, Dr. Reddy's, Glenmark, Mylan, Lupin, Teva, and Zydus.

91.     The limited number of pravastatin manufacturers facilitated those manufacturers' ability to coordinate pricing of their respective products. This concentration also made it easy for them to monitor prices in the downstream market and police deviations from agreed-upon prices.

92.     As the dominant players in the pravastatin market, Defendants were able to fix, raise, and maintain their prices for pravastatin without competitive threats from rival generic drug manufacturers.

### 5.    Manufacturers of Generic Pravastatin Have Overlapping Products

93.     The dominant manufacturers of generic pravastatin also make several other drug products and thus, have overlapping product portfolios with other non-pravastatin producing generic manufacturers. This product overlap incentivizes these manufacturers to coordinate production and sales of these overlapping products. For example, many pravastatin manufacturers also make digoxin and doxycycline, two drugs that are the subjects of both a DOJ criminal investigation and numerous civil class actions in *In re Generic Digoxin and Doxycycline Antitrust Litigation* now pending before Judge Cynthia Rufe in the District Court for the Eastern District of Pennsylvania, as well as other generic drugs

| Generic Company | Digoxin | Doxycycline | Divalproex ER | Pravastatin |
|---|---|---|---|---|
| Actavis | | ✓ | | ✓ |
| Apotex | | | | ✓ |
| Dr. Reddy's | | | ✓ | ✓ |
| Impax | ✓ | ✓ | ✓ | |
| Glenmark | | | | ✓ |
| Lannett | ✓ | ✓ | | |
| Lupin | | | | ✓ |
| Mayne | | ✓ | | |
| Mylan | ✓ | ✓ | ✓ | ✓ |
| Par | ✓ | ✓ | ✓ | |
| Sun | ✓ | ✓ | | |
| Teva | | ✓ | | ✓ |
| West-Ward | ✓ | ✓ | | |
| Zydus | | | ✓ | ✓ |

:

94.     This product overlap provided these manufacturers with the opportunity and
incentive to conspire to fix prices and allocate sales of these products.

### 6.     Defendants' Pricing Actions Were Against Their Self-Interest

95.     Competitive firms in a competitive, commoditized marketplace will typically
price their products aggressively, relative to their competitors' products. Firms price aggressively
with the understanding that if they do not do so, other competitors undercut their relatively high

price, taking sales—and ultimately market share—away from the firms that are pricing less aggressively.

96.     Here, however, Defendants failed to price aggressively relative to their competitors. Rather than attempt to take sales, revenue, and market share away from one another, Defendants instead sought to meet the price increases made by others and extract supracompetitive prices from Plaintiff and members of the Classes.

97.     Such conduct was against Defendants' self-interest because rather than cut prices to gain sales, revenues, and market share, Defendants instead sought to sacrifice these potential gains in favor of cartel pricing. Defendants' failure to cut prices in the face of price increases from competitors suggests that Defendants were conspiring to fix and raise prices, rather than competing on price.

### 7.    Memberships in the Same Trade Associations Provided Defendants With Opportunities to Conspire

98.     In order to be sustained, conspiracies require periodic communications between its members to ensure that all are adhering to the collective scheme.

99.     Defendants were members of trade associations, which they used to facilitate their conspiratorial communications and implement their price-fixing scheme. One such trade association is the Generic Pharmaceutical Association ("GPhA"), which is the largest association of generic pharmaceutical manufacturers.

100.    Current "Regular Members" of the GPhA include Defendants Actavis, Apotex, Dr. Reddy's, Glenmark, Lupin, Mylan, Teva, and Zydus. Regular Members are entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar products; or (4) DESI products.

101.    Several of Defendants' high-ranking officers also serve on GPhA's Board of Directors, including: Apotex's Jeff Watson, Dr. Reddy's Alok Sonig, Lupin's Paul McGarty, Mylan's Heather Bresch, Teva's Debra Barrett, and Zydus' Joseph Renner. Actavis's Bob Stewart previously served as a GPhA Board member. Ms. Bresch serves as the GPhA's current Chairperson.

102.    Representatives from Defendants attended meetings held by GPhA. The following table lists some of the GPhA meetings attended by Defendants' employees (other generic drug manufacturers attended as well):

| Meeting | Meeting Date and Location | Attendees |
| --- | --- | --- |
| 2012 GPhA Annual Meeting | February 22-24, 2012, Orlando, Florida | Actavis, Mylan, Teva |
| 2012 GPhA Fall Technical Conference | October 1-3, 2012, Bethesda, Maryland | Actavis, Apotex, Glenmark, Lupin, Mylan, Dr. Reddy's, Teva, Zydus |
| 2013 GPhA Annual Meeting | February 20-22, 2013, Orlando, Florida | Actavis, Apotex, Glenmark, Lupin, Mylan, Teva, Dr. Reddy's, Zydus |
| 2013 GPhA CMC Workshop | June 4-5, 2013, Bethesda, Maryland | Actavis, Dr. Reddy's, Glenmark, Teva, Zydus |
| 2013 GPhA Fall Technical Conference | October 28-30, 2013, Bethesda, Maryland | Actavis, Apotex, Glenmark, Lupin, Mylan, Teva, Dr. Reddy's, Zydus |
| 2014 GPhA Annual Meeting | February 19-21, 2014, Orlando, Florida | Actavis, Apotex, Lupin, Mylan, Teva, Dr. Reddy's, Zydus |
| 2014 GPhA CMC Workshop | June 3-4, 2014 | Apotex, Dr. Reddy's, Glenmark, Lupin, Teva, Zydus |

103.    Defendants also routinely gathered at non-GPhA sponsored events. For example, Defendants' representatives attended the annual JP Morgan Healthcare Conferences in 2012 and 2013, as did representatives of other generic drug manufacturers.

| Meeting | Meeting Date and Location | Attendees |
|---|---|---|
| 30th Annual JP Morgan Healthcare Conference | January 2012, San Francisco, California | Actavis, Mylan, Lupin, Teva |
| 31st Annual JP Morgan Healthcare Conference | January 7-10, 2013, San Francisco, California | Actavis, Glenmark, Mylan, Teva |

104.    Thus, it is not surprising that, according to public reports, DOJ's criminal probe is focusing on trade associations, including GPhA, because these trade associations may have been used by Defendants' sales representatives to coordinate and implement their anticompetitive scheme.

105.    Upon information and belief, Defendants' employees discussed their anticompetitive scheme to raise, maintain, and stabilize the prices of pravastatin, as well as other drugs, and how to allocate markets and customers, at these meetings, among others.

## GOVERNMENT INVESTIGATIONS INTO GENERIC DRUG PRICING

### A.    Congressional Investigations into Generic Drug Pricing

106.    As news reports have proliferated with respect to the dramatic rise in price of certain generic drugs, members of Congress have expressed a growing concern as to what is driving these price hikes. On October 2, 2014, Representative Elijah E. Cummings, the Ranking Member of the House Committee on Oversight and Government Reform, and Senator Bernard Sanders, Chairman of the Subcommittee on Primary Health and Aging, Senate Committee on Health, Education, Labor and Pensions, "sent letters to 14 drug manufacturers requesting

information about the escalating prices of generic drugs used to treat everything from common medical conditions to life-threatening illnesses."[18]

107.    These letters were delivered to the heads of Actavis, Apotex, Dr. Reddy's, Impax, Mylan, Par, Teva, and Zydus, among others—including Endo Pharmaceuticals plc, Heritage Pharmaceuticals Inc., and Marathon Pharmaceuticals, LLC—seeking information about the pricing of many generic drugs, including divalproex ER, pravastatin, digoxin, doxycycline, albuterol sulfate, glycopyrrolate, neostigmine methylsulfate, benazepril/hydrochlorothiazide, Isuprel® (isoproterenol hydrochloride), and Nitropress® (nitroprusside). The following Defendants received letters from Senator Sanders and Representative Cummings concerning pravastatin:

| GENERIC MANUFACTURER |
| --- |
| Apotex |
| Dr. Reddy's |
| Mylan |
| Teva |
| Zydus |

108.    Each letter stated:

This dramatic increase in generic drug prices results in decreased access for patients. According to the National Community of Pharmacists Association (NCPA), a 2013 member survey found that pharmacists across the country "have seen huge upswings in generic drug prices that are hurting patients['] and pharmacies[']

---

[18] Ranking Members Cummings and Chairman Sanders Investigate Staggering Price Increases for Generic Drugs, http://www.sanders.senate.gov/download/face-sheet-on-generic-drug-price-increases?inline=file.

ability to operate" and "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." These price increases have a direct impact on patients' ability to purchase their needed medications. The NCPA survey found that "pharmacists reported patients declining their medication due to increased co-pays," and "84% of pharmacists said that the acquisition price/lagging reimbursement trend is having a 'very significant' impact on their ability to remain in business to continue serving patients."[19]

109.    Further, Senator Sanders and Representative Cummings published a table in connection with their letters, demonstrating the massive price increases that pravastatin has experienced over the past several years:

| Drug | Use | Average Market Price Oct. 2013 | Average Market Price April 2014 | Average Percentage Increase |
|---|---|---|---|---|
| Pravastatin Sodium (bottle of 500, 10 mg tablets) | used to treat high cholesterol and to prevent heart disease | $27 | $196 | 573% |

110.    In addition to sending letters to the generic drug manufacturers listed above, Senator Sanders and Representative Cummings wrote a joint letter to Sylvia Burwell, the Department of Health and Human Services Secretary, stating, "The federal government must act immediately and aggressively to address the increasing costs of these drugs."[20]

111.    The Senate Subcommittee on Primary Health and Aging held a hearing on November 20, 2014. Although the Presidents and CEOs of Lannett, Teva, and Marathon

_____

[19] *See, e.g.*, Ltr. from Sen. Bernard Sanders & Rep. Elijah E. Cummings to Arthur P. Bedrosian (Oct. 2, 2014), http://www.sanders.senate.gov/download/letter-to-mr-bedrosian-president-and-ceo-lannett-company-inc?inline=file (citing Letter from B. Douglas Hoey to Sen. Tom Harkin, et al. (Jan. 8, 2014), https://www.ncpanet.org/pdf/leg/jan14/letter-generic-spikes.pdf)).

[20] Congressional Panel to Probe Generic Drug Price Hikes (Nov. 11, 2014), http://www.sanders.senate.gov/newsroom/press-releases/congressional-panel-to-probe-generic-drug-price-hikes.

Pharmaceuticals were scheduled to attend the hearing, none appeared. Many panelists agreed that reduced competition across various generic drugs has contributed to the price hikes observed in the overall market.

112.    Subsequent congressional hearings concerning the dramatic rise of generic drug prices were held in December 2015 and February 2016. At the U.S. Senate Special Committee on Aging's December 9, 2015 hearing, Erin D. Fox, PharmD Director of the Drug Information Service of the University of Utah, noted the deleterious effect these drug prices have had on patient access and healthcare, stating, "When medication prices increase in an unpredictable and dramatic way, this can create an access issue for hospitals and patients. If hospitals cannot afford to stock a product in the same amount due to price increases, this effectively creates a shortage."[21]

113.    On February 24, 2015, Senator Sanders and Representative Cummings wrote to Daniel R. Levinson, the Inspector General of the Department of Health and Human Services, imploring the department to "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[22] On April 13, 2015, Inspector General Levinson responded to Senator Sanders and Representative Cummings's letter, stating that his office planned "to update our previous review of generic drug price increases under the Medicaid drug rebate program."[23]

---

[21] Statement of Erin R. Fox, PharmD Director, Drug Information Service, Hearing on "Sudden Price Spikes in Off-Patent Drugs: Perspectives from the Front Lines" (Dec. 9, 2015), at 7, http://www.aging.senate.gov/imo/media/doc/SCA_Fox_12_9_15.pdf.

[22] Letter from Hon. Bernard Sanders and Elijah Cummings to Hon. Daniel Levinson (Feb. 24, 2015), http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[23] Letter from Hon. Daniel Levinson to Hon. Bernard Sanders (Apr. 13, 2015), http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

B.     **Federal and State Antitrust Investigations into Defendants' Generic Drug Pricing**

114.    Generic pricing patterns have also captured the attention of federal and state enforcement authorities in the United States. Many Defendants and other generic drug manufacturers have received subpoenas or requests for information concerning their pricing of generic drugs, as well as their communications with their competitors for those drugs.

115.    Initial reports suggest that, at the beginning, the probes were focused on two generic drugs: digoxin and doxycycline. However, recent news reports have confirmed the sweeping nature of the DOJ's investigation: at least two-dozen drugs and a dozen drug companies are under criminal investigation. Indeed, according to *Bloomberg* and other news agencies, the DOJ's investigation has progressed to such a degree that the first criminal charges could be filed by the end of 2016.

116.    A federal grand jury investigating the matter is empaneled in the Eastern District of Pennsylvania. The result of these investigations could result in the imposition of substantial fines and criminal pleas for generic manufacturers, and jail time for company executives. Some analysts have estimated that the DOJ could impose fines in excess of $1 billion.[24]

117.    To date, the generic drug companies contacted in connection with both federal or state antitrust probes include:

118.    *Lannett.* In July 2014, Lannett revealed in SEC filings that they had received subpoenas from the CTAG in connection with its investigation into whether "anyone engaged in a contract, combination or conspiracy in restraint of trade or commerce which has the effect of

---

[24] Eric Saonowsky, *DOJ's price-fixing investigation could lead to sizable liabilities, analyst says*, FiercePharma (Nov. 10, 2016), http://www.fiercepharma.com/pharma/doj-s-price-fixing-investigation-could-lead-to-sizable-liabilities-analyst-says.

(i) fixing, maintaining or controlling prices of digoxin or (ii) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law."[25]

119.    The information and documents sought by the CTAG included: (1) the identification of "all persons at Lannett with any supervisory, executive or other significant non-ministerial responsibility related to the pricing or sale of Digoxin"; (2) the identification and production of "all documents or communications referring or relating to any decision(s), by you or any other company, to increase the price of Digoxin"; (3) the production of "[a]ll marketing plans, strategic plans or any other documents relating to the development, manufacture and commercialization of Digoxin"; and (4) the identification and production of "written compliance policy directed to the antitrust laws."

120.    Five months later, on November 10, 2014, Lannett disclosed in an SEC filing that a senior sales and marketing executive was served with a DOJ grand jury subpoena "relating to a federal investigation of the generic industry into possible violations of anti-trust laws."[26]

121.    On December 5, 2014, Lannett disclosed in a Form 8-K that it received another "grand jury subpoena related to the continuing federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."[27] Lannett further disclosed that the "subpoena requests corporate documents from the Company relating to corporate, financial, and employee information, communications or correspondence with competitors

_____

[25] Impax Laboratories (IPXL) Receives Subpoena from Connecticut AG, http://www.streetinsider.com/Corporate+News/Impax+Laboratories+(IPXL)+Receives+Subpoena+from+Connecticut+AG/9662945.html; Lannett Receive Inquiry from Connecticut Attorney General, http://finance.yahoo.com/news/lannett-receives-inquiry-connecticut-attorney-153300612.html.

[26] Ed Silverman, *Justice Department Probes Generic Companies After Price Hike Reports*, Wall. St. J. (Nov. 10, 2014).

[27] Lannett SEC Form 8-K (Dec. 5, 2014), http://www.sec.gov/Archives/edgar/data/57725/000110465914085406/a14-25827_18k.htm.

regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products."[28] In a 2015 SEC filing, Lannett further disclosed that the federal subpoenas requested information and documents for the period 2005 through the dates the subpoenas were issued.

122.    Most recently, in June 2016, the CTAG "issued interrogatories and a subpoena to an employee of the Company in order to gain access to documents and responses previously supplied to the [DOJ]."[29]

123.    *Impax.* In July 2014, Impax disclosed that it received a subpoena from the CTAG concerning Impax's sales of generic digoxin and whether it agreed with others to fix prices or allocate customers or territories. In November 2014, Impax disclosed that it also received a federal grand jury subpoena requesting testimony and documents about "any communication or correspondence with any competitor about the sale of generic drugs."[30] The scope of the subpoenas was not limited to a particular drug or a particular timeframe.

124.    Later, Impax further disclosed that on March 13, 2015, "the Company received a grand jury subpoena from the Justice Department requesting the production of information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular the Justice Department's investigation currently focuses on four

---

[28] *Id.*

[29] Lannett SEC Form 10-Q (Nov. 4, 2016),
https://www.sec.gov/Archives/edgar/data/57725/000110465916154924/a16-19144_110q.htm.

[30] Impax SEC Form 8-K (Nov. 6, 2014),
https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

generic medications: digoxin, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[31]

125.  **Par.** The federal grand jury's probe continues to expand. In an SEC Form 10-K for 2014, Par disclosed that it had received a subpoena from DOJ "requesting documents related to communications with competitors regarding our authorized generic version of Covis's Lanoxin® (digoxin) oral tablets and our generic doxycycline products."[32] Moreover, in that same filing Par revealed that the CTAG served a subpoena on Par on August 6, 2014 "requesting documents related to our agreement with Covis Pharma S.a.r.l. to distribute an authorized generic version of Covis's Lanoxin® (digoxin) oral tablets."[33] Par stated that it completed its response on October 28, 2014.

126.  **Actavis.** Actavis's parent Allergan plc also disclosed in public filings that they received subpoenas from DOJ. Allergan reported that, on June 25, 2015, Actavis received a subpoena from DOJ "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[34]

127.  **Mylan.** Mylan similarly disclosed in a 2016 SEC filing that it received a subpoena from DOJ "seeking information relating to the marketing, pricing, and sale of our generic Doxycycline products and any communications with competitors about such products."[35] Mylan received a similar subpoena from the CTAG, seeking "information relating to the marketing,

---

[31] Impax, SEC 2015 Form 10-K, at F-53.

[32] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K, at 37. Covis Pharmaceuticals received a similar subpoena.

[33] *Id.*

[34] Allergan, SEC 2015 Form 10-K, at F-106.

[35] Mylan, SEC 2015 Form 10-K, at 160.

pricing and sale of certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[36]

128.    More recently, on November 10, 2016, Mylan disclosed that DOJ issued a subpoena to Mylan and certain employees and senior management "seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products and any communications with competitors about such products."[37]

129.    Significantly, Mylan also disclosed that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[38] The issuance of warrants represents a significant escalation of the DOJ's investigation because to obtain a warrant, the government must demonstrate "probable cause."

130.    *Sun.* On or about May 28, 2016, Sun disclosed that it had received a subpoena from DOJ "seeking information about the pricing and marketing of the generic drugs it sells in the United States."[39] DOJ also sought documents related to "employee and corporate records and communications with competitors."[40]

131.    *Dr. Reddy's*. On or about August 11, 2016, Dr. Reddy's disclosed in an SEC filing that it had received a subpoena from the DOJ on July 6, 2016, "seeking information

---

[36] *Id.*

[37] Mylan SEC Form 10-Q, at 58 (Nov. 10, 2016), http://apps.shareholder.com/sec/viewerContent.aspx?companyid=ABEA-2LQZGT&docid=11678486#MYL10Q_20160930XDOC_HTM_S582E80BDD4215D11A4040D12D4C2E297.

[38] *Id.*

[39] India's Sun Pharma Gets U.S. Subpoena Over Generic Drugs Pricing, Fortune (May 28, 2016), http://fortune.com/2016/05/28/sun-pharma-drug-price-subpoena.

[40] *Id.*

2846e4dd257a60f3

relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[41] In that same filing, Dr. Reddy's disclosed that it had received a subpoena from the CTAG concerning the same matters.

132.    *Mayne.* In its 2016 Annual Report, Mayne Pharma Ltd. disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena form the Antitrust Division of the US Department of Justice [] in the last two years seeking information relating to marketing, pricing and sales of select generic drugs."[42] In the same Annual Report, Mayne Pharma also disclosed that it had received a subpoena from the CTAG seeking similar information.

133.    *Teva.* On August 4, 2016, Teva disclosed that "[o]n June 21, 2015, Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[43] In that same filing, Teva disclosed that on July 12, 2016, "Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations."[44]

134.    *Taro.* On September 9, 2016, Taro disclosed that on September 8, 2016, it and two senior officers in Taro's commercial team, "received grand jury subpoenas from the United

---

[41] Dr. Reddy's, SEC Form 6-K (Aug. 31, 2016).

[42] Mayne Pharma, 2016 Annual Report, at 75.

[43] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), http://ir.tevapharm.com/phoenix.zhtml?c=73925&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTExMDcyODU1JkRTRVE9MCZTRVE9MCZTUUFU0M9U0VDVElPTl9FTlRJUkUmc3Vic2lkPTU3

[44] *Id.*

- 39 -

States Department of Justice, Antitrust Division, seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[45]

135.    ***Zydus.*** Although Zydus is not publicly traded in the United States and thus not subject to reporting requirements under federal securities laws, recent press reports have stated the Zydus is also a target of the DOJ's sweeping investigation.[46] According to one article, Zydus is being investigated in connection with its marketing and sale of divalproex ER.[47]

## ANTITRUST IMPACT

136.    During the relevant period, Plaintiff and Class Members purchased substantial amounts of pravastatin indirectly from Defendants. As a result of Defendants' illegal conduct, these purchasers have paid, and continue to pay, artificially inflated prices for pravastatin. The prices paid were substantially higher than the prices that Plaintiff and Class Members would have paid absent the illegal conduct alleged in this Complaint.

137.    As a consequence, purchasers of pravastatin have sustained substantial losses and damage to their business and property in the form of overcharges—and their losses continue to

---

[45] Taro, SEC Form 6-K (Sept. 9, 2016), http://phx.corporate-ir.net/phoenix.zhtml?c=114698&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcuG1sP2lwYWdlPTExMTM0MjUwJkRTRVE9MCZTRVE9MCZTUURFU0M9U0VDVElPTl9FTlRJRUkUkUmc3Vic2lkPTU3.

[46] Rupali Mukherjeel, *US polls, pricing pressure may hit Indian pharma cos*, The Times of India, http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian-pharma-cos/articleshow/55301060.cms.

[47] *Hillary win may pose pricing challenges for pharma cos: Report*, F. World (Nov. 7, 2016), http://www.firstpost.com/world/hillary-win-may-pose-pricing-challenges-for-pharma-cos-report-3093544.html.

date. The full amounts, forms, and components of such damages will be calculated after discovery and upon proof at trial.

138.    Defendants' efforts to restrain competition in the markets for pravastatin have substantially affected interstate commerce—and continue to do so.

139.    At all material times, Defendants manufactured, promoted, distributed, and sold substantial amounts of pravastatin in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States. Defendants' anticompetitive conduct had substantial intrastate effects in every state of purchase because, among other things, consumers and third-party payors within each state were forced to pay supracompetitive prices for pravastatin.

140.    At all times, Defendants transmitted funds and contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of pravastatin.

141.    Economists recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Professor Herbert Hovenkamp explains that "[e]very person at every stage in the chain will be poorer" as a result of the anticompetitive price at the top. [48] He also says that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."[49]

142.    The institutional structure of pricing and regulation in the pharmaceutical drug industry ensures that overcharges at the higher level of distribution are passed on to end-payors.

---

[48] *See* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice*, at 564 (1994).
[49] *Id.*

Wholesalers and retailers passed on the inflated prices of pravastatin to Plaintiff and Class Members.

143.    Defendants' anticompetitive conduct enabled Defendants to charge consumers and third-party payors prices in excess of what they otherwise would have been able to charge absent Defendants' unlawful actions.

144.    The prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

145.    The inflated prices that Plaintiff and Class Members have paid for pravastatin, and continue to pay, are traceable to and the foreseeable result of, the overcharges caused by Defendants.

## CLASS ALLEGATIONS

146.    Plaintiff brings this action as a class action, under Fed. R. Civ. P. 23(a) and (b)(2), on behalf of themselves and a nationwide class of similarly situated individuals seeking injunctive and equitable relief:

> **The Injunctive Class**:
> All persons or entities in the United States and its territories who indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for pravastatin, other than for resale, for consumption by itself, its families, or its members, employees, insureds, participants, or beneficiaries, from at least as early as October 1, 2013 through and including the date that the anticompetitive effects of Defendants' unlawful conduct ceased.

147.    Plaintiff also brings this action as a class action, under Fed. R. Civ. P. 23(a) and (b)(3), on behalf of themselves and a class of similarly situated individuals seeking damages arising from Defendants' conduct as described below:

**The Damages Class**:
All persons or entities who indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for pravastatin, other than for resale, for consumption by itself, its families, or its members, employees, insureds, participants, or beneficiaries, from at least as early as October 1, 2013 through and including the date that the anticompetitive effects of Defendants' unlawful conduct ceased, in any of the following states, commonwealths, and territories: Alabama, Arizona, California, Florida, Hawaii, Iowa, Kansas, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and the District of Columbia.

148.    The following persons and entities are excluded from the above-described Classes:

(a)    Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

(b)    All governmental entities, except for government-funded employee benefit plans;

(c)    All persons or entities who purchased pravastatin for purposes of resale or directly from Defendants or their affiliates;

(d)    Fully-insured health plans (plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members);

(e)    Flat co-payers (consumers who paid the same co-payment amount for brand and generic drugs); and

(f)    The judges in this case and any members of their immediate families.

149.     Members of the Classes are so numerous that joinder is impracticable. Plaintiff believes that there are thousands of members of each class.

150.     Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and members of the Classes were damaged by the same wrongful conduct by Defendants in that they paid artificially inflated prices for pravastatin as a result of Defendants' wrongful conduct— and continue to do so.

151.     Plaintiff will fairly and adequately protect and represent the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes.

152.     Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation, and with experience in class action antitrust litigation involving pharmaceutical products.

153.     Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendants have acted on grounds generally applicable to each member of the Injunctive Class and Damages Class.

154.     Questions of law and fact common to members of both Classes include:

(a)      the identity of the participants in the conspiracy;

(b)      whether Defendants conspired to fix, raise, maintain, and stabilize the prices of pravastatin;

(c)      whether Defendants conspired to allocate markets or customers with respect to pravastatin;

       (d)     whether Defendants' conduct harmed competition in the pravastatin market;

       (e)     whether Defendants' activities alleged herein have substantially affected interstate and intrastate commerce;

       (f)     whether, and to what extent, Defendants' conduct caused antitrust injury to the business or property of Plaintiff and members of the Classes in the nature of overcharges;

       (g)     the amount of overcharges paid by Plaintiff and members of the Classes in the aggregate; and

       (h)     the injunctive and other equitable relief needed to end Defendants' restraint and to restore competition in the pravastatin market.

155.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in management of this class action.

156.    Plaintiff knows of no special difficulty to be encountered in this action that would preclude its maintenance as a class action.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Violation of Sherman Act § 1, 15 U.S.C. § 1**
**(By Plaintiff and Injunctive Class Members Against All Defendants)**

157.    Plaintiff incorporates the preceding paragraphs by reference.

158.    Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme to fix, raise, maintain, and stabilize the prices of pravastatin, and allocate markets and customers for pravastatin—and continue to do so.

159.    Had Defendants competed instead of conspiring to restrain trade, Plaintiff and Injunctive Class Members would have paid substantially lower prices for pravastatin.

160.    Defendants intended, and accomplished, a price-fixing conspiracy and horizontal market allocation of the markets for pravastatin, which are *per se* violations of Section 1 of the Sherman Act. By their agreement, Defendants intentionally and wrongfully conspired and combined in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. As a result of this unreasonable restraint on competition, Plaintiff and Injunctive Class Members paid artificially inflated prices for pravastatin—and continue to do so.

161.    Plaintiff and Injunctive Class Members have suffered harm, and are continuing to suffer harm, as a result of paying higher prices for pravastatin than they would have absent Defendants' anticompetitive conduct and continuing anticompetitive agreements. Plaintiff and Injunctive Class Members also face a continuing threat of injury from the unlawful conduct alleged in this Complaint.

162.    Plaintiff and Injunctive Class Members have purchased substantial amounts of pravastatin indirectly from Defendants.

163.    Plaintiff and Injunctive Class Members seek a declaratory judgment pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) that Defendants' conduct violates Section 1 of the Sherman Act.

164.    Plaintiff and Injunctive Class Members also seek equitable and injunctive relief, including disgorgement of profits, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

## SECOND CLAIM FOR RELIEF

### State Antitrust Violations
### (By Plaintiff and Damages Class Members Against All Defendants)

165.    Plaintiff incorporates the preceding paragraphs by reference.

166.    Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme to fix, raise, maintain, and stabilize the prices of pravastatin and allocate markets and customers for pravastatin —and continue to do so.

167.    Defendants' unlawful conduct harmed Plaintiff and Damages Class Members in the manner explained above.

168.    Defendants' unlawful conduct covered a sufficiently substantial percentage of the relevant market to harm competition.

169.    Defendants' actions constitute horizontal market allocation and price-fixing agreements between actual and potential competitors and are illegal *per se* under state antitrust laws.

170.    Defendants' supra competitive pricing constitute a continuing violation of the laws of the states listed below in that each purchase by Plaintiff or a member of the Damages Class of supra competitively priced pravastatin caused injury to their business or property—and continue to do so.

171.    Defendants' conduct violated the following state laws:

(a)    Ala. Code § 6-5-60, with respect to purchases in Alabama by members of the Damages Class;

(b)    Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona by members of the Damages Class;

(c)    Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by members of the Damages Class;

(d)    D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia by members of the Damages Class;

(e)    Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by members of the Damages Class;

(f)    Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii by members of the Damages Class;

(g)    Iowa Code §§ 553 *et seq.*, with respect to purchases in Iowa by members of the Damages Class;

(h)    Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by members of the Damages Class;

(i)    Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by members of the Damages Class;

(j)     Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine by members of the Damages Class;

(k)     Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by members of the Damages Class;

(l)     Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by members of the Damages Class;

(m)    Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by members of the Damages Class;

(n)     Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska by members of the Damages Class;

(o)     Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada by members of the Damages Class;

(p)     N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico by members of the Damages Class;

(q)     N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York by members of the Damages Class;

(r)     N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina by members of the Damages Class;

(s)     N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases in North Dakota by members of the Damages Class;

(t)     Or. Rev. Stat. §§ 6.46.705, *et seq.*, with respect to purchases in Oregon by members of the Damages Class;

      (u)     R.I. Gen. Laws §§ 6-36-1 *et seq.*, with respect to purchases in Rhode Island by members of the Damages Class;

      (v)     S.D. Codified Laws Ann. §§ 37-1, *et seq.*, with respect to purchases in South Dakota by members of the Damages Class;

      (w)     Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by members of the Damages Class;

      (x)     Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by members of the Damages Class;

      (y)     Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by members of the Damages Class;

      (z)     W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by members of the Damages Class; and

      (aa)     Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by members of the Damages Class.

172.    Plaintiff and Damages Class Members have been and continue to be injured in their business or property by Defendants' antitrust violations. Their injuries consist of: (1) being denied free and open competition between competitors in the markets for pravastatin; and (2) paying higher prices for pravastatin than they would have paid in the absence of Defendants' wrongful conduct. These injuries are of the type the above antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

173.    Plaintiff and Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

174.   Defendants are jointly and severally liable for all damages suffered by Plaintiff and Damages Class Members.

175.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the above-listed state antitrust laws.

### THIRD CLAIM FOR RELIEF

**Unjust Enrichment**
**(By Plaintiff and Damages Class Members Against All Defendants)**

176.   Plaintiff incorporates the preceding paragraphs by reference.

177.   To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

178.   Defendants have benefited and continue to benefit from the overcharges on sales of pravastatin made possible by the unlawful and inequitable acts alleged in this Complaint.

179.   Defendants' financial benefits are traceable to Plaintiff's and Damages Class Members' overpayments for pravastatin.

180.   Plaintiff and Damages Class Members have conferred and continue to confer an economic benefit upon Defendants in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and Damages Class Members.

181.   It would be futile for Plaintiff and Damages Class Members to seek a remedy from any party with whom they had or have privity of contract. Defendants have paid no consideration to anyone for any of the benefits they received indirectly from Plaintiff and Damages Class Members.

182.   It would be futile for Plaintiff and Damages Class Members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they

indirectly purchased pravastatin, as those intermediaries are not liable and would not compensate Plaintiff and Damages Class Members for Defendants' unlawful conduct.

183.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for pravastatin is a direct and proximate result of Defendants' unlawful practices.

184.    The financial benefits Defendants derived rightfully belong to Plaintiff and Damages Class Members, who paid, and continue to pay, anticompetitive prices that inured to Defendants' benefit.

185.    It would be inequitable under unjust enrichment principles under the laws of each of the states in the United States and the District of Columbia for Defendants to retain any of the overcharges Plaintiff and Damages Class Members paid for pravastatin that were derived from Defendants' unfair and unconscionable methods, acts, and trade practices.

186.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Damages Class.

187.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of Plaintiff and Damages Class Members.

188.    A constructive trust should be imposed upon all unlawful or inequitable sums Defendants received that are traceable to Plaintiff and Damages Class Members.

189.    Plaintiff and Damages Class Members have no adequate remedy at law.

## DEMAND FOR JUDGMENT

Accordingly, Plaintiff, on its own behalf and on behalf of the proposed Classes, demands judgment that:

A.      Determines that this case may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), directs that reasonable notice of this case be given to members of the Classes under Rule 23(c)(2), and declares that Plaintiff is a proper representative of the Classes;

B.      Declares that Defendants' conduct violated Section 1 of the Sherman Act, the other state statutes set forth above, and the common law of unjust enrichment;

C.      Enjoins Defendants from continuing their illegal activities;

D.      Enters judgment against Defendants joint and severally and in favor of Plaintiff and the Classes;

E.      Grants Plaintiff and the Injunctive Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

F.      Awards the Plaintiff and the Damages Class damages and, where applicable, treble, multiple, punitive, and other damages, in an amount to be determined at trial, including interest;

G.      Awards Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

H.      Grants further relief as necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, as the Court deems just.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of

itself and the proposed classes, demands a trial by jury on all issues so triable.

Dated: December 5, 2016

EDELSON & ASSOCIATES, LLC

_____

MARC H. EDELSON (PA 51834)
LIBERATO P. VERDERAME (PA 80279)
3 Terry Drive, Suite 205
Newtown, PA 18940
Tel: (215) 867-2399
Fax: (267) 685-0676
medelson@edelson-law.com
lverderame@edelson-law.com

PAUL J. SCARLATO (PA 47155)
**GOLDMAN SCARLATO & PENNY, P.C.**
8 Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, PA 19428
Tel: (484) 342-0700
Fax: (484) 580-8747
scarlato@lawgsp.com

*Counsel for Plaintiff Philadelphia Federation
of Teachers Health and Welfare Fund and the
Proposed Classes*